UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Thomas Lynch,                     )
                                  )
        Plaintiff,                )
                                  )
        v.                        )    No. 05 C 3065
                                  )
Alpharma, Inc.                    )
                                  )
        Defendant.                )
                                  )

**MEMORANDUM ORDER AND OPINION**

MARVIN E. ASPEN, District Judge:

Plaintiff Thomas E. Lynch filed a two count complaint against defendant Alpharma, Inc. wherein he alleges that Alpharma terminated him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq., and Section 510 of ERISA, 29 U.S.C. § 1140. Presently before us is Alpharma's motion for summary judgment. As explained below, we grant the motion.

**BACKGROUND**[1]

In 1981, Lynch began working for Alpharma's animal feed division "as an operator and production supervisor for [the] Chicago Heights [production] facility." (Pl. Resp. to Def. Mot. for Summ. J. (hereinafter "Pl. Resp. to Mot.") at 1.) Over the course of his 24 year tenure, Lynch

---

[1] Defendants object to various portions of Lynch's 56.1 Statement as based on inadmissible hearsay evidence. We considered those portions of plaintiff's submissions which could be admissible under one of the exceptions to the prohibition against hearsay since we must draw all reasonable inferences in favor of the non-movant for purposes of summary judgment.

1

successfully rose through the ranks to become the production superintendent, who is responsible for overseeing the daily operations, including safety and supervisory obligations. (*Id.;* Def. Mot. for Summ. J. (hereinafter "Def. Mot."); Pl. Facts ¶ 77.)

**A.     The Chemical Spill**

On March 24, 2005, Lynch accepted a delivery of caustic soda, a chemical used at the facility, but was required to pump approximately 150 gallons of the chemical into day tanks because the entire load would not fit in the caustic tank. (Def. Facts ¶ 23; Pl. Resp. to Def. Facts ¶ 23.) Some of the caustic soda spilled into the dike surrounding the caustic tank, which was designed to capture any overflow. (Pl. Resp. to Mot. at 2.) Alpharma's Emergency Response Plan sets out protocols for handling chemical spills depending on the volume and type of chemical involved. (Def. Facts ¶ 12; Pl. Resp. to Def. Facts ¶ 12.) "Fifty-five (55) gallons or less of [caustic soda] ... would be considered incidental with anything more being considered a large spill." (*Id.*) "Large spills require the production superintendent to notify the [Emergency Coordinator,]" (Def. Facts ¶ 13; Pl. Resp. to Def. Facts ¶ 13.), whereas minor or incidental spills only require employees to report the situation to a supervisor and to the Division EHS Manager in a monthly report. (Pl. Facts ¶ 80.)

The parties dispute whether the caustic soda spill was large or incidental. On March 25, Mark Burnison observed three to four inches of the liquid chemical in the dike. (*Id.*) That same day "[Norm] Hansen estimated the level of caustic soda in the dike at ten inches." (Def. Facts  ¶ 40; Pl. Facts ¶ 96.) Based on Hansen's measurements, Bryan Hunt calculated that 600 gallons of caustic soda were in the dike. (*Id.*) However, on March 24, Lynch only "observed 1 to 2 inches of caustic material in the dike, amounting to no more than 50 gallons." (Pl. Facts ¶ 85.) Lynch testified that he had also noticed "4 to 5 inches of caustic residue on the bottom and sides of the dike resulting

2

from a prior overflow[, which would] amount to approximately 200 to 300 gallons of caustic material." (Pl. Facts ¶ 95.)

Regardless of the extent of the spill, it is undisputed that Lynch did not apprise Hunt, the Emergency Coordinator, of the incident on March 24. (Pl. Resp. to Def. Facts ¶ 35.) Rather, Lynch briefed Hansen, his assistant and subordinate, and informed him that he would need to fill out an incident report because Lynch was scheduled to go on vacation for nine days beginning March 25. (Pl. Resp. to Def. Facts ¶ 31; Pl. Facts ¶ 88.)

It is also undisputed that "Lynch had personal supervisory responsibility for internal clean ups." (Pl. Resp. to Def. Facts ¶ 34.) In an attempt to fulfill his duties, Lynch left a note for "Manuel Maddox, the most qualified operator, to clean up the caustic overflow during the night shift[]" before Lynch left the facility on March 24th. (Pl. Resp. at ¶ 2; Pl. Resp. to Def. Facts ¶ 31.) Lynch advised Burnison, the production engineer, of his decision to have Maddox take care of the leak. (Pl. Resp. to Def. Facts ¶ 32; Pl. Facts ¶ 90.) However, Lynch forgot that he gave Maddox the night off. (Pl. Resp. to Def. Facts ¶ 30.) Consequently, the spill was not cleaned up until the next day, after Thorn Creek Sanitary District advised Alpharma that the sewer water coming out of the plant had an elevated pH level. (*Id.* ¶¶ 30, 36, 42.)

While searching for the source of the elevated pH levels, Burnison discovered that the containment dike had a leak, at which time he paged Hansen and reported his findings. (*Id.* ¶¶ 37-38.) Hunt and Stephanie Clemons, the safety coordinator, joined the group at the dike to assess the situation. Hunt asked Hansen to compose the incident report, but he then edited the document because Hansen's draft lacked sufficient detail and "contained a tone that was 'too soft' and 'not accusatory enough.'" (Pl. Facts ¶ 100.) However, the spill was not solely the result of

3

human error: while explaining the causes of the caustic leak to Thorn Creek Basin Sanitary District, Clemons noted that the "level meter on the caustic storage tank was not working properly[,]" (Pl. Facts ¶ 103.), and the incident report listed the condition of the containment dike as a contributing factor to the spill. (Pl. Facts ¶ 125.) Burnison and Hansen cleaned the chemical spill while Hunt went to speak with Mike McDaniel, the human resources manager to discuss the incident. (Def. Facts ¶ 43; Pl. Resp. to Def. Facts ¶¶ 37-38, 42; Pl. Facts ¶ 97.)

**B.     The Decision to Terminate Lynch**

Hunt and McDaniel then contacted Deric Cheuvront, Director of Human Resources, and Terry Wilcox, Director of Manufacturing, to discuss appropriate disciplinary measures for Lynch. (*Id.* ¶ 45.) "The group decided Hunt and McDaniel should meet with Lynch to hear his side of the story before making any final decisions." (*Id.* ¶ 48.) At the meeting with his superiors, Lynch explained that the caustic overflow did not "seem like it was that much ... of a spill." (Pl. Resp. to Def. Facts ¶ 49.) "Hunt repeatedly told Lynch he should have reported the spill to him. Lynch and Hunt disagreed over what incidents need to be reported." (Def. Facts ¶ 52; Pl. Resp. to Def. Facts ¶ 52.) Hunt and McDaniel reported to Wilcox and Cheuvront about the meeting with Lynch, informing them that Lynch "continued to believe that his course of action, leaving a note for an off-duty operator to clean up a caustic spill and then leaving on a 9-day vacation, was acceptable for someone in his position of authority." (Def. Facts ¶¶ 53, 54; Pl. Resp. to Def. Facts ¶ 54.)

Hunt, McDaniel, Wilcox, and Cheuvront believed that Lynch's length of service to the company, his "knowledge of the plant and production process[,]" and his rapport with other employees all weighed in his favor. (Def. Facts ¶ 61; Pl. Resp. to Def. Facts ¶ 61.) McDaniel testified that during discussions concerning disciplining Lynch, the group considered "Mr. Lynch's

4

position within the company; the fact that he was a manager and had managerial responsibility. And towards Mr. Lynch's benefits, we also discussed his length of service with the company." (Pl. Resp. to Def. Facts ¶ 75.) However, the "issue of Mr. Lynch's eligibility for benefits did not enter the discussion." (Def. Resp. to Pl. Facts ¶ 150 (quoting McDaniel Dep. at 76).) Hunt, McDaniel, Wilcox, and Cheuvront all agreed that Lynch should be held to a high standard because of his supervisory role.

Alpharma's Employee Handbook lists certain infractions and potential corresponding disciplinary action. According to the handbook, failure to follow procedures are categorized as "minor offenses," which generally warrant progressive discipline. However, the handbook also outlines the company's policy to "reserve the right to forego any disciplinary steps based upon severity and nature of an infraction and for even the first offense, and, thereby, subject the employee to immediate termination." (Pl. Facts ¶ 119; Def. Resp. to Pl. Facts ¶ 119.) On April 8, 2005, at a meeting with Hunt and McDaniel, Hunt gave Lynch a letter terminating his employ with Alpharma for "'failure to follow established procedures' which 'resulted in a serious safety issue.'" (Def. Facts ¶ 64; Def. Resp. to Pl. Facts ¶ 118.) "Hunt testified that he relied upon Alpharma's Safety, Health & Environmental Disciplinary Policy when making the determination to terminate Plaintiff's employment." (Pl. Facts ¶ 120; Def. Resp. to Pl. Facts ¶ 120.)

### C.  Lynch's Replacement

Before Alpharma found a replacement for Lynch, his duties were re-assigned to other employees. "The ages of the Alpharma employees who temporarily assumed Lynch's former job duties were never discussed[.]" (Def. Facts ¶¶ 65, 66.) Tony Picciano, the interim site director,

5

offered Craig Anderson, a former Chicago Heights plant superintendent, the position of plant superintendent on a trial-basis.[2] (Def. Facts ¶ 67.) During the trial period, Anderson repaired equipment at the plant and successfully increased productivity. (Pl. Resp. to Def. Facts ¶ 68.) As a result, Picciano offered Anderson a permanent position as plant superintendent. (Def. Facts ¶ 68.) Anderson, who is 8 years, 1 month and 21 days younger than Lynch, accepted the offer on September 20, 2005. (*Id.* ¶¶ 68, 70)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (quotation marks omitted). Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding

---

[2] Anderson had been responsible for a caustic overflow when he had previously worked at the Chicago Heights facility. (Pl. Facts ¶ 147.) Alpharma did not formally discipline Anderson for the incident. (*Id.*) However, Anderson did not "share the same job description and job duties as the Alternative Site Coordinator and Production Superintendent that Lynch held at the time of the [March 24, 2005] spill." (Def. Resp. to Pl. Facts ¶ 147.)

whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## ANALYSIS

Lynch argues that defendants terminated him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq., and Section 510 of ERISA, 29 U.S.C. § 1140. "The ADEA prohibits employers from discriminating against employees [over 40 years old] based on [their] age [] with respect to ... privileges of employment. To maintain a[n] ADEA [claim], employees must establish that they would not have suffered adverse treatment 'but for' the employer's motive to discriminate based on [] age." *Woolner v. Flair Comm. Agency, Inc.*, No. 01 C 6043, 2004 WL 2032717, at *3 (N.D. Ill. Aug. 30, 2004) (internal citations omitted). Lynch can establish his ADEA claim by offering direct proof of age discrimination or by presenting evidence indirectly under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under either method, summary judgment is inappropriate if Lynch proffers evidence from which an inference of intentional discrimination can be drawn. *See Fuka v. Thompson Cons. Elecs.,* 82 F.3d 1397, 1402-03 (7th Cir. 1996). Lynch argues that he can establish a genuine issue of material fact of intentional discrimination under the indirect method. (Pl. Resp. to Mot. at 3.)

*McDonnell Douglas* sets out a three step analysis to assess unlawful discrimination in the absence of direct proof. 411 U.S. 792. First, the plaintiff must establish a *prima facie* case of discrimination. *Id.* at 802. If the plaintiff fails to meet his or her initial burden, the defendant is entitled to summary judgment. *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001). Assuming that the plaintiff satisfies the first step, the burden shifts to the defendant to offer

a legitimate nondiscriminatory reason for its action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in so doing, the burden shifts back to the plaintiff to present evidence that the reason provided by the defendant is pretextual. *See id.* at 804.

To satisfy the *prima facie* case requirement, Lynch must show that (1) he is a member of a protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action, and (4) defendants treated similarly situated substantially younger employees more favorably. *Russell v. Bd. of Trustees of Univ. of Ill. at Chicago,* 243 F.3d 336, 341 (7th Cir. 2001). It is undisputed that Lynch can establish the first and third elements: he is over the age of 40 and his termination was an adverse employment action. The second and fourth prongs of the *prima facie* case are more problematic.

In cases like the one before us, in which the employer claims that it dismissed plaintiff due to poor job performance, the second prong is inextricably intertwined with the question of pretext. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001). Defendants assert that they fired Lynch because of his "'failure to follow established procedures' which 'resulted in a serious safety issue.'" (Def. Facts ¶ 64; Def. Resp. to Pl. Facts ¶ 118.) Lynch submits that he did not need to report the "incidental" spill to his superiors and that he should not have been terminated based on one incident given his 24 years of performance with the company. (Pl. Resp. to Mot. at 4-5.) We need not decide which party is correct to ascertain whether Lynch has established his *prima facie* case. The *McDonnell Douglas* analysis must be applied flexibly, and in circumstances where the dispute centers on whether the employee was dismissed for failing to meet expectations or for discriminatory reasons, it is acceptable to bypass the second prong and address the issue when we analyze pretext. *See Curry v. Menard, Inc.,* 270 F.3d 473, 478 (7th Cir. 2001).

### A. Similarly Situated Substantially Younger Employees

We thus move to the fourth prong, where Lynch's case fails. Lynch has not identified any other similarly situated substantially younger worker who was treated more favorably. To be "similarly situated," plaintiff must show that employees: (1) held the same or similar employment positions; (2) had similar employment histories; and (3) engaged in similar misconduct giving rise to the employment action. *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 338 (7th Cir. 1993); *see also Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (internal citations omitted) ("[P]laintiff must show that he is similarly situated with respect to performance, qualifications, and conduct."). The Seventh Circuit considers an age "disparity less than ten years presumptively insubstantial." *Karotis v. Navistar Int'l Trans. Corp.,* 131 F.3d 672, 677 n.1 (7th cir. 1997) (quotation omitted); *see also Radue,* 219 F.3d at 619 ("[T]o satisfy the 'substantially younger' requirement, the relevant individual must be at least ten years younger than the plaintiff."). "If the age difference is less than ten years, the plaintiff may still 'present a trial claim if [he] directs the court to evidence that [his] employer considered [his] age to be significant' in the making of the contested employment decision." *Woolner*, 2004 WL 2032717, at *3; *Dell'Aringa v. SBC Global Svcs., Inc.*, No. 01 C 4995, 2002 WL 31109447, at *6 (N.D. Ill. Sep. 20, 2002) (finding that if no similarly situated employees are substantially younger, plaintiff "can still present a triable claim through evidence that the employer viewed his age as significant.").

In an attempt to identify similarly situated employees, Lynch points to Alpharma's failure to terminate Hansen and Hunt for their involvement with the caustic spill. However, neither Hansen, nor Hunt were similarly situated to Lynch. As process support specialist, Hansen's status and duties differed from Lynch, who was the plant superintendent and alternate emergency coordinator. (*See*

9

Hansen Dep. at 113-15.); *see also Jackson v. Northeastern Illinois University*, No. 99 C 6740, 2000 WL 1853331, at *3 (N.D. Ill. Dec. 18, 2000) (finding that a supervisor was not similarly situated to a lower level employee). Hansen primarily worked in an administrative capacity assisting Lynch with office work whereas Lynch focused on running the plant and production. In addition, Lynch, rather than Hansen, was responsible for getting the spill cleaned. Also, unlike Lynch, Hansen did not eschew his reporting responsibilities in regards to the caustic spill on March 24, 2005: there was no need to report the spill to Lynch, Hansen's direct supervisor, because Lynch was the one who informed Hansen of the spill. Therefore, the fact that management opted not to discipline Hansen, who is twelve years younger than Lynch, is not circumstantial evidence of pretext or discrimination.

Similarly, Alpharma's failure to terminate Hunt, the site director and emergency coordinator, *solely* based on the caustic spill incident is not indicative of pretext or discrimination. First, Hunt, Lynch's superior, had a different position and different job duties than plaintiff. Moreover, the nature of Lynch's and Hunt's performance problems differed: as site director, Hunt was ultimately responsible for the crack in the containment dike, but he was not "lackadaisical" or in complete dereliction of his duties once apprised of the situation as opposed to management's perception of Lynch's performance (or lack thereof).[3] Lynch also claims that Hunt's decision to allow Alpharma employees rather than outside contractors clean up the spill is as serious a violation of the safety policies as failing to report a spill and failing to promptly redress the problem. (Pl. Facts ¶ 98.) Even assuming the veracity of Lynch's assertion, he cannot show that Alpharma treated Hunt more favorably due to his age because Hunt does not qualify as "substantially younger" than Lynch. In

---

[3] Alpharma later fired Hunt, in part based on the caustic soda spill incident.

this circuit, "substantially younger means at least a ten year age difference; any age disparity less than ten years is 'presumptively insubstantial.'" *Karotis,*131 F.3d at 677 (citing *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997)). Hunt is only nine years and eleven months younger than Lynch and thus is presumptively insubstantially younger.[4] *Radue,* 219 F.3d at 619 (finding that two employees were not substantially younger than a plaintiff in an ADEA action because one was only seven years younger and the other was nine years and five months younger); *Smolek v. Village of Palos Park*, No. 99 C 8001, 2001 US DIST LEXIS 8395, at *11 (N.D. Ill. Jun. 21, 2001) ("[T]o find that nine years and ten months is 'close enough' ... would undermine the Seventh Circuit's attempt to create a bright line test for determining whether ran allegation of age disparity is sufficient to give rise to an inference of age discrimination.")

Nonetheless, Lynch "may still 'present a triable claim if [he] directs [us] to evidence that [his] employer considered [his] age to be significant' in the making of the contested employment decision." *Woolner*, 2004 WL 2032717, at *3 (quoting *Hartley*, 124 F.3d at 893). However, as will be discussed below, Lynch presented no direct evidence of age discrimination, nor does the indirect evidence suggest that Alpharma's decision to terminate plaintiff was motivated by his age. *See id.* at *3-4 (granting summary judgment on an ADEA claim for failure to satisfy the forth prong of a *prima facie* case because the age disparity (eight years) of similarly situated employees was insubstantial and no other direct evidence indicated age was a significant factor in the employment decision).

---

[4] Lynch does not argue that he can satisfy the forth prong of his *prima facie* case based on his replacement, Craig Anderson. Nonetheless, in an abundance of caution, we observe that any such argument would fail. Lynch submitted no evidence suggesting that Anderson, an experienced Alpharma employee who once acted as a plant superintendent, was unqualified for the position or that he was substantially younger than plaintiff.

11

### B. Pretext

Even assuming Lynch successfully presented a *prima facie* case of age discrimination, the evidence does not suggest that Alpharma's non-discriminatory reason for firing plaintiff – violation of safety regulations – is pretextual. "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). To prove pretext, plaintiff must squarely rebut the specific reason for the challenged action articulated by the defendant. *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 349 (7th Cir. 1997). The question is whether the employer honestly believes its proffered reasons for discharge. *Sample v. Aldi, Inc*., 61 F.3d 544, 548 (7th Cir. 1995). It is the "perception of the decision-maker" that controls the pretext analysis. *See Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 337-38 (7th Cir. 1991) (quoting *Weihaupt v. Am. Med. Ass'n,* 874 F.2d 419, 428 (7th Cir. 1989). Therefore, "[e]ven if [Lynch] views the incident differently, to survive summary judgment he must call into question the honesty of [Alpharma's] belief that [his violation] was significant."[5] *Dell'Aringa,* 2002 WL 31109477, at *6 (quotation omitted).

Alpharma contends that it fired Lynch because he neglected to follow company safety procedures. Lynch has failed to show us that there is any reason to question the sincerity of the reasoning behind Alpharma's decision. Defendant's reason for plaintiff's termination is credible, supported by the facts, and was sufficient to motivate the action. In any event, we find that the

---

[5] It is well established that we are not to sit as "super personnel departments to second guess an employer's facially legitimate business decisions." *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1007 (7th Cir. 2002). "[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions." *Id.* at *7; *Hartley,* 124 F.3d at 890 ("Plaintiffs lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless.").

defendant's decision to terminate plaintiff was not unreasonable.

To show pretext, Lynch claims that "(1) Defendant deviated from the safety discipline policy by terminating Plaintiff; (2) Bryan Hunt acted with a discriminatory animus against older employees; (3) Defendant's decision makers specifically considered Plaintiff's age when deciding to terminate Plaintiff; and (4) Defendant truly had no interest in protecting the safety of employees when discharging Plaintiff's employment." (Pl. Resp. to Mot. at 10.) First, a plain reading of Alpharma's Employee Handbook and the Safety, Health & Environmental Disciplinary Policy reveals that Lynch was not fired in derogation of the company's policies. The employee handbook describes the rules of conduct and potential consequences for improper behavior in the workplace:

> Some of these rules are so serious that even a single violation may result in discharge[] (<u>Major Offenses</u>). Employees with other violations may be warned and provided another chance (<u>Minor Offenses</u>)[.] Obviously, everything could not be covered in theses rules. This list does <u>not</u> include all reasons for discipline ... This progressive disciplinary system does not alter the employment-at-will relationship as set forth in this Handbook. The Company reserves the right to forego any disciplinary steps listed based upon the severity and nature of an infraction and for even the first offense and, thereby, subject the employee to immediate termination.

(Pl. Appx. Ex. T at 32 (Employee Handbook).) The Safety, Health & Environmental Disciplinary Policy echoes the policy articulated in the employee handbook and "provides suggested progressive levels of discipline for types of unsafe behavior; however, Alpharma reserves the right to forego any disciplinary steps, based on the severity and nature of an incident. A single incident may result in disciplinary action, up to and including termination." (Def. Facts Ex. L (introduction to Safety Health & Environmental Disciplinary Policy memorandum).)

Alpharma elected to terminate Lynch rather than follow a progressive disciplinary program in accordance with the discretionary nature of its policies. Alpharma did not act in derogation of

13

their established policies and the policies themselves do not support an inference that the proffered reason for Lynch's termination, failure to follow established safety procedures, is pretextual. Moreover, Lynch has not submitted evidence of disparate application of the company's policies since he failed to identify a similarly situated employee who was treated more favorably. *See* Section A, *supra*.

Second, Lynch claims that Alpharma's purported nondiscriminatory reason for firing him is pretextual because Hunt had a "discriminatory animus against older employees[,]" and thus he tainted the deliberative process. (Pl. Resp. to Mot. at 11.) In support of his argument, Lynch references two allegedly discriminatory comments Hunt made over two years before he fired plaintiff. Shortly after assuming the role of site director, Hunt allegedly told Lynch, "You make too much money." (Pl. Facts ¶ 137.) A month or two later, Hunt also said, "Well, I don't know how someone with your educational background has advanced as far as you have, but we are going to change things around here." (*Id.* at ¶ 138.) Neither comment explicitly references Lynch's age, nor do they evince age discrimination on their face. Additionally, neither comment pertained to the caustic soda spill or the decision to terminate Lynch in 2005. A stray remark, which is not even facially discriminatory, uttered long before the employment action in question, is insufficient to show pretext.

Plaintiff also relies on Hunt's decision to hire McDaniel instead of another, substantially older, applicant that Lynch favored. (Pl. Resp. to Mot. at 11.) However, McDaniel was qualified for the job and nothing indicates that Hunt's preference for McDaniel was based on illegal criteria. *Cf. Olson v. Northern FS, Inc.,* 387 F.3d 632, 635-36 (7th Cir. 2004) (finding that an employer's decision to replace an experienced, successful salesman with a substantially younger individual with

no sales experience coupled with the supervisor's comment that "despite his experience, [the ADEA plaintiff] was undesirable in the business world because of his age[,]" was sufficient to show pretext). None of Hunt's alleged instances of discriminatory animus occurred "around the time of, and [] in reference to, the adverse employment action complained of." *Hunt v. City of Markham, Illinois,* 219 F.3d 649, 652-53 (7th Cir. 2000). Therefore, the evidence is insufficient to infer intentional discrimination or pretext in regards to Hunt's decision to terminate Lynch.

Third, contrary to plaintiff's contention, the record does not suggest that Lynch's age was a motivating factor in the decision to terminate his employment with Alpharma. To support his argument, Lynch relies on the undisputed fact that Hunt, McDaniel, Wilcox, and Cheuvront "were aware that Plaintiff worked for Defendant for more than twenty-four years, indicating that [he] was over the age of forty, at the time that they considered disciplining [him]." (Pl. Resp. to Def. Facts ¶ 62.) Additionally, "the issue of a potential age discrimination lawsuit was discussed on April 7, 2005, after Hunt and McDaniel met with Plaintiff." (*Id.*) However, mere knowledge of an employee's age and discussing the possibility of a lawsuit in and of itself does not evince pretext or discrimination. To hold otherwise would subject companies to liability for consulting with counsel prior to issuing discipline or for engaging in a deliberative process before rendering judgment. While certain individuals expressed concern over potential ramifications of a lawsuit and employee morale, no evidence supports an inference that Lynch's age factored into the disciplinary process.[6] Rather, the decision-makers relied upon the figures reported in the incident report,

---

[6] Plaintiff appears to argue that Hunt's desire to increase the severity of the tone in the incident report indicates that Hunt intended to fire Lynch from the outset and subsequently tainted the deliberation process with his discriminatory animus. (Pl. Resp. to Mot. at 12.) As previously discussed, however, the evidence does not support an inference that Hunt was motivated by Lynch's age when he recommended to termination.

15

Lynch's explanation of the situation, and his response thereto.

Finally, Lynch claims that Alpharma was not really concerned with safety at the plant because abnormal pH levels regularly occurred at the facility, not all employees with responsibility for the crack in the containment dike were disciplined, and the employees working with Lynch considered him "the most valuable resource person in fermentation production." (Pl. Resp. to Mot. at 12.) However, despite drawing all reasonable inferences in Lynch's favor, the evidence does not indicate that Alpharma's asserted concern for safety was a lie or a pretext for discrimination. Therefore, Lynch's ADEA claim fails.

### C. ERISA

Lynch claims that Alpharma fired him in order to prevent his retirement health benefits from vesting in violation of ERISA. Section 510 of ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ..." 29 U.S.C. § 1140. To survive a motion for summary judgment on the ERISA claim, Lynch must show, via the direct or indirect method, that Alpharma had "the specific intent to deprive [him] of his plan rights." *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 796 (7th Cir. 2005). "[Lynch] must ultimately show that a desire to frustrate attainment or enjoyment of benefit rights contributed toward the employer's decision[.]" *Id.; Lindemann v. Mobil Oil Corp.,* 141 F.3d 290, 295 (7th Cir. 1998) ("To prove a violation of section 510, plaintiffs must establish more than a loss of benefits; they must demonstrate that their employers terminated them with the specific intent of preventing or retaliating for the use of benefits.").

Lynch relies on the temporal proximity between the time he was fired and when his

retirement benefits (including lifetime medical coverage) would vest to demonstrate an ERISA violation. (*See* Pl. Facts ¶¶ 148-49; Def. Resp. to Pl. Facts ¶ 149.) Merely losing benefits as a consequence of an employment action is insufficient to support an ERISA claim. *Lindemann*, 141 F.3d at 295 (quotation omitted) ("[N]o action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination.").

Based on the proffered evidence, Lynch cannot establish a *prima facie* case under § 510. Moreover, we need not delve into the *prima facie* analysis since Alpharma "has advanced a legitimate, nondiscriminatory reason for its action." *Isbell,* 418 F.3d at 796. As discussed in Section B, *supra*, the record evidence does not indicate that Alpharma's proffered reason for terminating Lynch is pretextual. "[P]laintiff, who carries the burden of proof, has failed to point us to any evidence in the record in support of [his] conclusion that his supervisors even considered, must less relied on, [his] past or future receipt of short-term disability benefits in their termination decision." *Lindemann,* 141 F.3d at 296. The fact that plaintiff was terminated within months of his pension rights vesting is not suspicious because Alpharma based its decision on Lynch's involvement with the caustic spill *See Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 658 (7th Cir. 1991). Additionally, McDaniel's use of the term "benefits" while discussing potential disciplinary action for Lynch is not probative. "[A] trier of fact may not infer action from knowledge [of employee benefits] alone. Otherwise, every worker who lost his job within months, or perhaps years, before the full vesting of his pension would have a prima facie case of age discrimination." *Visser*, 924 F.2d at 658. Lynch submitted no evidence to rebut McDaniel's testimony that the "issue of Mr. Lynch's eligibility for benefits did not enter the discussion." (Def. Resp. to Pl. Facts ¶ 150 (quoting McDaniel Dep. at 76).) Therefore, we grant defendant's motion for summary judgment on the

ERISA claim.

## CONCLUSION

Based on the reasons described above, we grant Alpharma's motion for summary judgment. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: 4/27/06